Stanley S. Arkin, Esq.
ARKIN SOLBAKKEN LLP
590 Madison Ave., 35th Floor
New York, New York 10022
(212) 333-0200
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

WARREN LICHTENSTEIN,

                    Plaintiff,

- against -

ANDREW CADER

                    Defendant.

------------------------------------------------------------x

No. _____

**COMPLAINT**

(ECF Case)

13 CV 2690-LAK

Plaintiff Warren Lichtenstein ("Plaintiff"), by and through his attorneys, Arkin Solbakken LLP, as and for his Complaint against Defendant Andrew Cader ("Defendant") respectfully alleges as follows:

## NATURE OF THE ACTION

1.     This action arises from a conspiracy to defraud Plaintiff, conjured by an embittered former girlfriend and her present lover and chief financier.

2.     As set forth below, Defendant Cader and his co-conspirator Annabelle Bond schemed to manipulate the legal process employed in a court proceeding now pending in Hong Kong to achieve a financial windfall -- at Plaintiff's expense.

3.     The predicates for this plan include, but are by no means limited to, a series of false representations and material omissions of fact which intentionally

mischaracterize as loans the many millions of dollars in cash and gifts Mr. Cader has freely given to Ms. Bond, his long time love.

4. Mr. Cader and Ms. Bond have and will continue to proffer these misleading and inaccurate statements as a means to secure foreign support orders of unjustified magnitude, which are unwarranted in fact or law.

5. Indeed, Ms. Bond (a self described "activist and adventurer") has relentlessly pursued the largest reported child maintenance order ever rendered in Hong Kong. This is not, however, driven by what is in the best interests of her five-and-one-half-year-old daughter. Instead, Ms. Bond looks to improve upon her own already extraordinary life of leisure, luxury, privilege and modest fame, first afforded to her by her parents – Sir John and Lady Elizabeth Bond.

6. Their conduct manifests not only a gross abuse of process and a plain and simple act of injustice – but also, actionable fraud in this state.

## PARTIES

7. Defendant Andrew Cader is a resident and citizen of New York, and accordingly is accountable to the Courts of this State. He is the former Chief Executive Officer of Spear, Leeds & Kellogg, which was purchased by Goldman Sachs for $7.5 billion. Mr. Cader is also part of the group that owns the Tampa Bay Rays.

8. Plaintiff Warren Lichtenstein is a resident and citizen of Colorado, and is the head of the Steel Partners companies.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over the Defendant pursuant to Federal Rule of Civil Procedure 4(k)(1)(A) based on Plaintiff's service of a summons on Defendant and

the fact that Defendant is subject to jurisdiction in a court of general jurisdiction in the State of New York.

10. This Court has jurisdiction over the claims set forth herein pursuant to 28 U.S.C. § 1332 because: (i) the matter in controversy exceeds $75,000; and (ii) and Plaintiff and Defendant Mr. Cader are citizens of different States.

11. Venue in New York County is proper pursuant to 28 U.S.C. § 1391(b)(1), (2) and/or (3), as Defendant, on information and belief, resides in this county, a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this county, or there is no district in which an action may otherwise be brought and Defendant is subject to the court's personal jurisdiction.

## BACKGROUND

12. Mr. Lichtenstein and Ms. Bond have a five-and-one-half-year-old daughter. Mr. Lichtenstein and Ms. Bond were once engaged but never married, their relationship ending amicably in 2007.

### A. Ms. Bond Spirits Mr. Lichtenstein's Child to Hong Kong

13. Ms. Bond is the daughter of Sir John Reginald Hartnell Bond, who was described by the press as "the corporate genius who turned HSBC into a banking colossus."

14. Sir John, who was Knighted in 1999 for his services to the banking industry, began his career with the Hong Kong and Shanghai Banking Corporation in 1961.

15. He and his wife, Lady Elizabeth Bond, have homes in the United Kingdom, Hong Kong, Aspen, and Florida (among other places). Sir Bond has served or

does serve executive functions on the International Advisory Board of Mitsubishi, China Development Forum and Shanghai's International Business Leader's Advisory Council.

16.   Ms. Bond subsequently commenced various proceedings in the United Kingdom seeking, among other things, support from Mr. Lichtenstein (hereinafter, the "U.K. Proceedings").

17.   The U.K. court determined that Mr. Lichtenstein would purchase a home in that jurisdiction in which his daughter would live. In compliance with that directive, Mr. Lichtenstein escrowed the funds until a home was purchased. This residence, however, was never purchased. In fact, Ms. Bond never even looked for a flat in the U.K.

18.   Instead, Ms. Bond induced Plaintiff to consent to allowing her to travel with their daughter from the U.K. to Hong Kong. Ms. Bond falsely represented to Mr. Lichtenstein that this trip would be for a temporary visit from August to December, similar to the temporary visits Ms. Bond and the daughter undertook to Hong Kong in the fall of the prior two years.

19.   Indeed, Ms. Bond's parents, Sir John Bond and his wife, Lady Bond, had prepared rooms for Ms. Bond and the daughter where it was understood they were to stay rent-free during their time in Hong Kong.

20.   After Ms. Bond and the daughter arrived in Hong Kong, however, Mr. Lichtenstein was granted an appeal in the U.K. Proceedings. This was a positive legal development for Mr. Lichtenstein, and a correspondingly negative legal development for Ms. Bond.

21.   Not long thereafter, Ms. Bond demanded that Mr. Lichtenstein allow their

child to move permanently to Hong Kong. That is, notwithstanding her representation that the visit to Hong Kong would not exceed a few months, Ms. Bond sought to take up permanent residence with Mr. Lichtenstein's child in a jurisdiction that was half a world away.

22. Mr. Lichtenstein initially declined Ms. Bond's demand, but eventually succumbed in the hopes of enhancing the possibility of a settlement of the case.

### B. Ms. Bond and Mr. Cader's Conspiracy to Misrepresent His Gifts To Her As Loans

23. Since this time, Plaintiff learned that Ms. Bond's boyfriend, Defendant Andrew Cader, signed a lease with a term beginning in July 2011, for a residence in the prestigious Victoria Peak and Strawberry Hill area of Hong Kong (the "Strawberry Hill Home"). This lease required Mr. Cader's monthly rent payments of HK$200,000 (which is approximately equal to $26,000 U.S. dollars). In addition, the lease required other substantial expenses to be paid by the tenant, as well as a six-month security deposit. Ms. Bond subsequently spent $600,000 furnishing the Strawberry Hill Home, as well as $100,000 to purchase a Range Rover vehicle.

24. Ms. Bond moved with Mr. Lichtenstein's daughter, and to this day the two continue to reside in Mr. Cader's Strawberry Hill Home.

25. Mr. Lichtenstein then brought proceedings in Hong Kong court seeking merely a mirror of the order issued in the U.K. Proceedings. Ms. Bond, however, then requested that the Hong Kong court order Mr. Lichtenstein to pay support for their child – in an amount triple to that granted by the Court in the U.K., including the rent on the Strawberry Hill Home leased by Mr. Cader (hereinafter, the proceedings in Hong Kong shall be referred to as the "Hong Kong Proceedings").

5

26. Ms. Bond represented to Mr. Lichtenstein (and in the Hong Kong Proceedings) that the over $3.5 million (in cash) given to her by Mr. Cader (the "Cash Gifts") and the rent Mr. Cader paid on the Strawberry Hill Home (the "Lease Payments") were merely loans from her lover that she was obligated to repay.

27. These representations are false. The Cash Gifts and Lease Payments from Mr. Cader – who, on information and belief, has a net worth of hundreds of millions of dollars – were gifts to his longtime paramour, Ms. Bond.

28. In any event, the Hong Kong court granted Ms. Bond's request in connection with its interim order without Mr. Lichtenstein having the opportunity to pursue any discovery or present any evidence.

29. Indeed, Mr. Cader is the sole individual listed on the lease agreement of the Strawberry Hill Home (the "Lease Agreement"), and the sole individual obligated to make the payments to the lessor under the Lease Agreement. Ms. Bond is nowhere mentioned in the Lease Agreement, and has no legal obligation to pay the debt incurred by this contract.

30. Consistent with this, Mr. Cader made the Lease Payments directly to the lessor, including by direct wire transfers from his accounts. Ms. Bond has made no lease payments on the Strawberry Hill Home – with or without funds provided to her by Mr. Cader. Instead, all or substantially all of these payments and/or the Cash Gifts were, on information and belief, made from New York by and through Mr. Cader's agents.

31. Moreover, as set forth above, Mr. Cader signed the lease on the Strawberry Hill Home in or about July 2011 – this was *before* the Hong Kong court granted (in July 2012) the application by Ms. Bond to permanently remove Mr.

6

Lichtenstein's daughter to Hong Kong. *Accordingly, Mr. Cader and Ms. Bond could not have determined at that time that Ms. Bond would ultimately be responsible for the amounts paid on the Strawberry Hill Home lease.*

32. In all events, as a result of and in reliance on Ms. Bond's false claims regarding the Lease Payments, the Hong Kong court increased Mr. Lichtenstein's monthly accommodation payments to Ms. Bond by HK$200,000 (which is the approximate equivalent of $26,000 U.S. dollars), which it has since declined to reduce.

33. These orders by the Hong Kong court requiring Mr. Lichtenstein to pay $26,000 per month have been entered without Mr. Lichtenstein having the opportunity to pursue any discovery or present any evidence. Instead, in reliance on the material misrepresentation that the Lease Payments were loans, not gifts, from Mr. Cader, the Court ordered Mr. Lichtenstein to pay USD$26,000 per month for rent for his five-year-old daughter.

34. The Hong Kong Court additionally ordered that Mr. Lichtenstein pay Ms. Bond HK$121,667 per month for other aspects of support Ms. Bond claimed are necessary for the child, in total obligating Mr. Lichtenstein to pay her HK$321,667, or $41,800 U.S. dollars, per month, plus school, tutoring, medical, travel, and other substantial expenses.

35. On information and belief, this is one of the largest – if not the largest – child support order *ever* issued by a Hong Kong court and is unprecedented. Indeed, in a recent Hong Kong litigation, a father raised the so-called "millionaire defense" – by which a parent is not required to disclose his or her wealth because he or she consents to pay whatever support amount the court orders for the child. Even in that instance, where

7

the Hong Kong court effectively assumed that the father at issue had unlimited wealth, an award of the approximately HK$120,000 a month – a fraction of the over HK$320,000 ordered here – was more than a sufficient support award.

36. Here, Ms. Bond has used the Hong Kong Proceedings as a means to obtain increased support obligations based on her false claims that the Cash Gifts and Lease Payments were loans from Mr. Cader that she is obligated to repay to him.

37. Mr. Cader and Ms. Bond, on information and belief, have perpetuated and will continue to perpetuate their scheme to defraud and falsely style the Cash Gifts and Lease Payments and as loans in order to induce the Hong Kong court to continue to increase Mr. Lichtenstein's support obligations.

38. Neither Mr. Cader nor Ms. Bond has provided *any* evidence whatsoever – documentary or otherwise – to support the claim that the Cash Gifts or Lease Payments were loans.

39. Despite requests for such information, no evidence has been produced demonstrating that Mr. Cader accounted for the Cash Gifts or Lease Payments as loans in his financial records or that Mr. Cader reports the same on his taxes as loans, and not gifts, which would occasion a substantial tax.

40. By letter to Ms. Bond's counsel, Mr. Lichtenstein set out his concerns as to Ms. Bond's assertion that the Cash Gifts and Lease Payments were loans.

41. Neither Ms. Bond nor her counsel has responded to this correspondence.

42. Mr. Lichtenstein also sent additional letters requesting from Ms. Bond information regarding the lease for the Strawberry Hill Home.

43. In their response, Ms. Bond's counsel indicated that a response to Mr.

Lichtenstein's inquiries would be provided solely if Mr. Cader desired to provide one. Ms. Bond's counsel's response did not claim that the Lease Payments were a loan, or, indeed, make any mention whatsoever of any loan.

44. Mr. Lichtenstein is unable to bring an appropriate corrective proceeding in the Hong Kong Proceedings because, among other reasons, Mr. Cader is not amenable to process in respect to the questions raised in this case. Moreover, discovery is limited under the rules applicable in the Hong Kong Proceedings, which thwarts Mr. Lichtenstein's ability to determine the truth of relevant facts. This proceeding is the only appropriate and effective way to obtain the truth about a core issue between the parties – to wit, a loan or a gift of a lover.

### C. Ms. Bond's Additional Demonstrably False Statements

45. Ms. Bond's false representations that the Cash Gifts and Lease Payments were loans were not her only such false statements. She made other false statements or material omissions of facts.

46. For example, Ms. Bond failed to state that she and Mr. Cader hold joint bank accounts and that she regularly uses credit cards with statements solely sent to and paid by Mr. Cader.

47. Also, on information and belief, Ms. Bond and her father, Sir John, conspired to and did make related false statements. Sir John, who, like his daughter and granddaughter, lives in Hong Kong, is a very wealthy, powerful, and prominent figure in Hong Kong.

48. Sir John recently resigned as Chairman of a Swiss mining company, named Xstrata. Prior to that appointment, Sir John served as the chairman the British

telecommunications company Vodafone, as well as the chairman of the international bank HSBC. Sir Bond also serves as a senior advisor to Kohlberg Kravis Roberts, & Co., L.P. and as Advisory Director to the Board of Northern Trust Corp., and previously served as a director of Ford Motor Company.

49. Sir John also served as a member of the Hong Kong Chief Executive's Council of International Advisers in the years of 1998-2005.

50. Sir John has numerous island and other homes throughout the world, and controls, on information and belief, numerous secret trusts.

51. Despite the above, Ms. Bond and Sir John, on information and belief, conspired to and did falsely represent to Mr. Lichtenstein that Sir John can no longer provide his regular monthly $2,500 support payments to his daughter.

### D. Mr. Cader Supports Ms. Bond, His Lover

52. Ms. Bond and her lover Mr. Cader travel internationally, and have repeatedly stayed together in the United States. They regularly travel in Mr. Cader's private airplane (an N198 MR – a Falcon 50 aircraft).

53. Just recently, in March 2013, Mr. Cader and Ms. Bond vacationed in Aspen, Colorado.

54. Mr. Cader and Ms. Bond's relationship, and the cash and gifts that mark it, continue to this day.

### E. Ms. Bond's Conduct is Consistent With Her History of Past Lovers and Finances

55. Ms. Bond's behavior with Mr. Lichtenstein and Mr. Cader is consistent with her past dealings with men.

56. Specifically, in the past Ms. Bond has gone from one millionaire lover to

another, spending millions of dollars of their money to support her lavish lifestyle, and has then moved on to her next wealthy lover or lovers to support her and finance her litigation efforts.

## F. The Conduct of Mr. Cader and Ms. Bond Should Not Be Tolerated in the United States or New York, and Also Appear to Be Crimes

57. See, for example, 18 USC § 1503(a), a federal felony, provides that: "Whoever ... corruptly ... influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished as provided in subsection (b)."

### AS AND FOR PLAINTIFF'S FIRST CAUSE OF ACTION
### (Conspiracy to Commit Fraud)

58. Plaintiff repeats and re-alleges the allegations set forth in the preceding paragraphs as if the same were fully set forth herein.

59. Ms. Bond made false statements of material fact, including but not limited to her misrepresentations that the Cash Gifts and Lease Payments were loans.

60. Ms. Bond knew these statements were false and made them with the intention of deceiving Mr. Lichtenstein and the Hong Kong court and to induce Mr. Lichtenstein and the Hong Kong court to act on those misrepresentations.

61. The Hong Kong court has thus far relied on these representations as being true in establishing an interim award of support. These misrepresentations have caused Mr. Lichtenstein to be required to pay inappropriately high child support.

62. The consequences of these misrepresentations include, but are not limited to, the Hong Kong court ordering Mr. Lichtenstein to make payments that are greater than they would have been absent Ms. Bond's misrepresentations relating to her

11

purported debt.

63. Mr. Cader, on information and belief, resides in New York and is a citizen of New York.

64. Ms. Bond and Mr. Cader agreed that the Cash Gifts and Lease Payments would be misrepresented to be loans. On information and belief, all or part of this agreement and/or the related conspiracy occurred in New York.

65. Bank records reflect that Mr. Cader made the Lease Payments directly to the lessor, including by direct wire transfers from his account. All or substantially all of these payments and/or the Cash Gifts were, on information and belief, made from New York by and through Mr. Cader's agents.

66. It was Ms. Bond's and Mr. Cader's common objective to cause the Hong Kong court to order Mr. Lichtenstein to make payments that are greater than they would have been absent Ms. Bond's misrepresentations relating to the purported debt.

67. On information and belief, Mr. Cader permitted and encouraged Ms. Bond to make these false representations so that he could avoid United States gift taxes and Ms. Bond could mislead Mr. Lichtenstein and the Hong Kong court as to the true state of her finances.

68. As a direct result of Ms. Bond's misrepresentations, Plaintiff has been damaged in an amount to be determined at trial, but in no event less than $100,000.

### AS AND FOR PLAINTIFF'S SECOND CAUSE OF ACTION
(Aiding and Abetting Fraud)

69. Plaintiff repeats and re-alleges the allegations set forth in the preceding paragraphs as if the same were fully set forth herein.

70. Ms. Bond made false statements of material fact to Mr. Lichtenstein and

the Hong Kong court, including but not limited to her misrepresentations that the Cash Gifts and Lease Payments were loans.

71. Ms. Bond knew these statements were false and made them with the intention of deceiving Mr. Lichtenstein and the Hong Kong court and to induce the Hong Kong court to act on those misrepresentations.

72. The Hong Kong court has thus far relied on these representations as being true in establishing an interim award of support. These misrepresentations have caused Mr. Lichtenstein to be required to pay inappropriately high child support.

73. On information and belief, Mr. Cader permitted and encouraged Ms. Bond to make these false representations so that he could avoid United States gift taxes and Ms. Bond could mislead the Hong Kong court as to the true state of her finances.

74. As a direct result of Ms. Bond's misrepresentations, Plaintiff has been damaged in an amount to be determined at trial, but in no event less than $100,000.

WHEREFORE, Plaintiff prays that judgment be entered in its favor and against Defendant as follows:

(i) On Plaintiff's first cause of action, damages in an amount to be determined at trial, but no less than $100,000;

(ii) On Plaintiff's second cause of action, damages in an amount to be determined at trial, but no less than $100,000;

(iii) An award of pre- and post-judgment interest, attorneys' fees, costs, and disbursements in connection with this action; and

(iv) Any other relief that the Court deems just and proper.

Dated: New York, New York
      April 23, 2013

                                  Respectfully submitted,

                                  ARKIN SOLBAKKEN LLP

                                  By: *[signature]*

                                  Stanley S. Arkin, Esq.
                                  (SDNY # SA-1373)
                                  SArkin@arkin-law.com
                                  590 Madison Ave., 35th Floor
                                  New York, New York 10022
                                  (212) 333-0200 (phone)
                                  (212) 333-2350 (fax)

                                  *Attorneys for Plaintiff*
                                  *Warren Lichtenstein*