D7HBLICC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   WARREN LICHTENSTEIN,

4                Plaintiff,

5          v.                          13 CV 02690 (LAK)

6   ANDREW CADER,

7                Defendant.

8   ------------------------------x
                                      New York, N.Y.
9                                     July 17, 2013
                                      9:36 a.m.
10
    Before:
11
                      HON. JAMES L. COTT,
12
    \                                  Magistrate Judge
13
                        APPEARANCES
14
    ARKIN SOLBAKKEN LLP
15       Attorneys for Plaintiff
    STANLEY S. ARKIN
16  ALEX REISEN

17  BLANK ROME LLP
         Attorneys for Defendant
18  SETH J. LAPIDOW
    MICHAEL A. ROWE
19

20

21

22

23

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

D7HBLICC

1        (In open court)

2        THE DEPUTY CLERK:  *Lichtenstein v. Cader*.  Counsel,

3   state your name for the record.

4        MR. ARKIN:  Stanley S. Arkin and Alex Reisen of Arkin

5   Solbakken on behalf of Mr. Lichtenstein.

6        MR. LAPIDOW:  Seth Lapidow and Michael Rowe Blank Rome

7   on behalf of Mr. Cader.

8        THE COURT:  Good morning, everybody.

9        MR. LAPIDOW:  Good morning, your Honor.

10        THE COURT:  I like seeing you all sitting at one table

11   together.  That's very symbolic.  Unfortunately, it's not as

12   symbolic as perhaps I would like.

13        Mr. Arkin, let me ask you first, has there, in fact,

14   been a decision by the Hong Kong court?

15        MR. ARKIN:  There is a decision by the Hong Kong

16   court.  I have a copy of it.  I received it subject to a

17   privilege from the Hong Kong lawyer.

18        THE COURT:  What does that mean exactly?

19        MR. ARKIN:  That's a very good question.  It's a

20   really good question because they have an extremely strict,

21   rigorous 18th Century perspective of such things.  And one of

22   the things I don't want to do, since I've been unappealing to

23   you in this court, together with my friend, is be unappealing

24   to the Hong Kong court.  And I have the thing -- I will make

25   inquiry as to whether I can produce it to Mr. Lapidow, who

1   may -- Mr. Lapidow's letter suggests that he has knowledge of

2   its findings or its holdings.  And I will seek to see if I

3   could get the document released.  I've asked my consulate or my

4   friend in Hong Kong to see if that was possible.

5          THE COURT:  Is it a law or practice in that court that

6   when decisions are issued by judicial bodies, that they are in

7   the first instance not made public?

8          MR. ARKIN:  This is not public.  I'm told it's

9   privileged because it may be a domestics relations matter.  And

10  I have not delved deeply into the intricacies of their

11  privilege customs and usages.  I can tell you that they are

12  different than ours albeit they're kind of a common law

13  jurisdiction.

14         I will seek to have Colin Cohen, who is the solicitor

15  in Hong Kong, see if he can get permission to provide a copy to

16  your Honor.  I have it in my possession but I am under, again,

17  a privilege.  By the way, I have nothing to hide in the

18  decision.  There's nothing about it --

19         THE COURT:  Well, I guess what I'm not understanding

20  is why is it that you can have a copy of it, but I can't or

21  opposing counsel can't?

22         MR. ARKIN:  That is a fair question and I have no

23  answer to it other than Mr. Cohen, Solicitor Cohen, gave it to

24  me with specific instructions that it was completely privileged

25  and I must not in any way distribute it or give it to anyone.

D7HBLICC

1    And I didn't question him, but I will now.

2              THE COURT:  Well, this is one of the reasons I didn't

3    want to adjourn today's proceeding because I wanted, among

4    other things, to understand what the state of play was, so to

5    speak --

6              MR. ARKIN:  Well, I can tell you that.

7              THE COURT:  -- with respect to this decision.  And I--

8              MR. ARKIN:  Well, I can tell you the state of play.

9    In my words, in my interpretation -- and I hope to make it less

10   unappealing than my last appearance -- the Court awarded

11   Ms. Bond the equivalent of 38 or 39 thousand dollars a month

12   and he awarded her, as well, the payments of tuitions and

13   medical and a driver and a variety of other emoluments which go

14   along with being the mother of the child Isabella.

15             And the Court went on to say that my client's

16   finances -- albeit we thought they were carefully and fully

17   explained.  He wasn't able to appear in Hong Kong during the

18   proceeding.  She spends, in her opinion, a good deal of time

19   justifying the absence of any depth of understanding of the

20   economics.  She relies upon the English opinion, the UK

21   opinion, which appear before they shifted jurisdictions.

22             But getting to Mr. Cader, which is that she first

23   mentions our lawsuit and then, in a later part of the opinion,

24   she says that there's no question-- or not no question.  She

25   says Mr. Cader's money, the money he gave to Annabelle Bond,

D7HBLICC

1    appear to be soft loans.  She doesn't really accept they're

2    anything other than soft loans; to wit, loans where you don't

3    have any particular time to pay it off--

4            THE COURT:  Is "soft loans" your phrase or the Court's

5    phrase?

6            MR. ARKIN:  The Court's phrase, your Honor.  Not my

7    phrase.  I would use a different phrase.

8            THE COURT:  I'm sure you would.

9            MR. ARKIN:  But I don't want to be unappealing, so I

10   wouldn't do that.  But she says "soft" and she says that -- or

11   acknowledges that there's no paper, there's no time to pay it

12   back, and so forth.  And she says, in any event, these are

13   monies he's giving her and I expect he'll continue to give them

14   to her.  He's a fellow, by the way, who rented this hugely rich

15   house on the top of the hill in Hong Kong.  But I'm going to

16   let her use that money as she sees fit for herself with no need

17   to contribute to the welfare or benefit of the child.

18            Obviously in the Hong Kong courts, there would be an

19   appeal on that very issue among others.

20            THE COURT:  Isn't the use of the money for the house

21   by definition for the benefit of the child in that the child

22   will be residing in the house?

23            MR. ARKIN:  Well--

24            THE COURT:  Maybe I misunderstand.

25            MR. ARKIN:  Yes, but not the entire house, your Honor.

D7HBLICC

1   It's not customary, as I understand it, in domestic relations

2   matters in any civilized part of the world to charge one parent

3   with the entire house when you have one child you are

4   supporting, and particularly when the couple is unwed.

5        The total amount of rent on the house-- and I don't

6   want to make this part of the domestic relations case here.

7   I'm not involved in that.  In the domestic relations case, they

8   actually permitted rent of $40,000 a month, I believe, and is

9   charging my client somewhere in the neighborhood of $20,000 a

10  month.

11       THE COURT:  Well, in any event, my time is somewhat

12  limited this morning because I'm on criminal duty, so let me

13  see if I can cut through this a little bit.  What you're

14  telling me is in the decision, which we don't necessarily know

15  whether I or your adversary will be able to have a copy of,

16  but--

17       MR. ARKIN:  But he's informed of its contents, though.

18       THE COURT:  Well, that's fine.  But as I understand

19  it, the Hong Kong Court did, in fact, address the issue of the

20  loan/gift with respect to Mr. Cader in the sense that, as

21  you've characterized it, the Court found that what was conveyed

22  by Mr. Cader to Ms. Bond was a "soft loan."  Is that correct?

23       MR. ARKIN:  Yes, sir.

24       THE COURT:  All right.  So my question then -- I guess

25  I want to hear briefly from you and briefly from Mr. Lapidow

D7HBLICC

1   about what you think we should do next.  I have my view about

2   that, but before I tell you what I think we should do next,

3   what do you think --

4            MR. ARKIN:  Well, I'll tell you --

5            THE COURT:  -- we should do next?

6            MR. ARKIN:  -- exactly what I think we should do next.

7   You have my letter which I sent to you yesterday, I assume.

8            THE COURT:  I do, and I have read it.

9            MR. ARKIN:  That's reassuring and comforting.

10           THE COURT:  Well, when you say "You have my letter," I

11   just want to be clear I not only have it, but I've read it.

12           MR. ARKIN:  That's a good thing to say for a Court.

13   Oftentimes I've had the opposite impression.  Never, of course,

14   in this Court.

15           THE COURT:  Go right ahead, Mr. Arkin.  Tell me --

16           MR. ARKIN:  I think the thing that we should do is

17   this.

18           THE COURT:  -- what you think we should do next.

19           MR. ARKIN:  I believe the impact of that money,

20   whether it's a loan or gift -- I believe it absolutely to be a

21   gift.  It would never pass an IRS examination in this country.

22   We ought to be able to examine Mr. Cader for a very brief,

23   discrete period of time.  I would convenience him as much as I

24   could.  And to have whatever papers, documents, communications

25   he's had with Annabelle Bond about these monies.  Any notes,

D7HBLICC

1    any documents, any e-mails, any writings which he has in

2    connection with the transaction.  He's given her, we believe,

3    well over $4 million.  We think that is a material item which

4    would impact the Court, Judge Bebe Chu, no matter what because

5    it's a lot of money.  Perhaps not by Ms. Annabelle Bond's

6    standards or her family's standards or Mr. Cader's standards,

7    but certainly is a lot of money in the context of this case

8    and, at the present time, to my client.

9         I just want a brief examination and I want some

10   documents.  If it looks to me like it's truly a loan, I'm going

11   to go away, your Honor, because then, if it's truly a loan,

12   then what I will do is hopefully seek to get some kind of

13   finding and give it to the court in Hong Kong.  Or I would, in

14   blunt terms, utilize that finding with any lawsuit which may at

15   some point proceed in this country to block the enforcement of

16   the Hong Kong judgment.  My view here is damages have been

17   suffered by my client, and I would bring in experts to

18   substantiate that by what happened here between Mr. Cader and

19   Ms. Bond.

20        So my request of this Court -- and I believe it a very

21   modest one -- is allowing me to examine for a short period of

22   time and get some documents.  I don't think that's asking too

23   much.

24        THE COURT:  So you want the limited discovery we've

25   discussed previously after which time you will either, to use

D7HBLICC

1    your phrase, go away -- what I assume that means is dismiss

2    this lawsuit-- or, alternatively, allow Mr. Lapidow following

3    that discovery to make whatever motion that he would like to

4    make because he obviously --

5              MR. ARKIN:  Assuming that we can--

6              THE COURT:  We can only speak one at a time.  So

7    while--

8              MR. ARKIN:  Thank you.

9              THE COURT:  -- I'm speaking, you have to let me--

10             MR. ARKIN:  No, I understand that.

11             THE COURT:  -- finish.  Thank you.

12             So if I can understand you, you want the limited

13   discovery we've discussed previously after which time one of

14   two things will happen:  Either motion practice would then go

15   forward at that point or, alternatively, you might in theory

16   dismiss the lawsuit.  Is that correct?

17             MR. ARKIN:  I might consider that.  What I certainly

18   would do is what information I obtain in the course of my very

19   brief discovery, I would provide it to the Hong Kong lawyers,

20   the Hong Kong solicitors and barristers.

21             THE COURT:  Well, what you do with respect to the

22   information you get in another court is really not of my

23   concern.

24             MR. ARKIN:  No, no, I know, but you're asking me what

25   I would do and that's what I would do.

D7HBLICC

1          THE COURT:  All right.  That's fine.

2          Let me hear from Mr. Lapidow.

3          MR. LAPIDOW:  Good morning, your Honor.  Thank you.

4          I guess I'm a little troubled by a couple of things

5  this morning.  First, I'm troubled that Mr. Arkin has had this

6  decision, he saw my letter, and has made no effort to see

7  whether he could get the decision from the Hong -- get a waiver

8  or something from the Hong Kong lawyers, to give it to both

9  your Honor and us.  To say, well, he'll look into it now seems

10  a bit odd to me.

11          It's my understanding of the confidentiality

12  restrictions that they're to protect disclosures by one party

13  about facts about the other.  And Mr. Arkin has told you facts

14  about Ms. Bond's award this morning that are news to me that I

15  think probably would have been covered by the confidentiality

16  order there.

17          The bottom line is I'm told by a brief discussion with

18  Ms. Bond's Hong Kong lawyers that this decision will be made

19  public.  It will be available on the website sometime in the

20  near future.  I've been checking every day; it hasn't come up

21  you yet.  Everything I know about the decision was in the

22  letter that I sent to the Court.  I know only the most general

23  terms of the loan; that the loan/gift issue was litigated and

24  there was a decision regarding it.  And that it's my

25  understanding that at the end of the day, the opinion of the

D7HBLICC

1   judge decided that Mr. Cader's loans or gifts -- I didn't know

2   right now about the "soft loan" finding-- were not relevant to

3   the amount of support Mr. Lichtenstein should pay.  I think

4   that puts this whole issue to bed.

5         There's now been a final order issued in Hong Kong

6   that relates to the issue before this Court.  Under the *Altman*

7   line of cases, that final order can't be collaterally attacked

8   in this proceeding because it's extrinsic-- it's intrinsic

9   fraud.  The *American Airlines* line of cases seems to indicate

10  that the Court should decline to exercise jurisdiction over

11  this kind of inquiry about fraud related to something that's

12  essentially matrimonial in nature.

13        So I think what should happen here is that the stay

14  should be lifted to allow us to renew our motion to dismiss,

15  have it adjudicated on what seems to me to be pretty

16  straightforward law, and we all let your Honor decide and we

17  all move on.  I don't see any reason why Mr. Cader should be

18  required to sit for a deposition or give documents when that

19  issue has been explored in the trial in Hong Kong.

20        I know for a fact that the letter that Mr. Cader

21  supplied to Hong Kong that was in evidence in the case puts

22  forth the amount of the loans.  Mr. Arkin doesn't have to

23  examine Mr. Cader to find out it was $4 million.  There's a

24  document in the case that says that.

25        I don't see what's left to explore here and I don't

D7HBLICC

1   see any reason why we shouldn't just move forward for a motion

2   to dismiss and let your Honor decide.  Frankly, I think this

3   case is now -- with the final judgment in Hong Kong, if it says

4   what Mr. Arkin says it says and what I'm led to believe it

5   says, this case is now bordering on the frivolous.

6          THE COURT:  Refresh my recollection.  I reviewed the

7   papers last night, but I want to just be precise about it.  You

8   advised me at the last proceeding we had that Mr. Cader had

9   produced certain documents to Ms. Bond's lawyers in the Hong

10  Kong proceeding.  Is that correct?

11         MR. LAPIDOW:  Correct.

12         THE COURT:  And are you familiar with what the scope

13  of those documents entailed?

14         MR. LAPIDOW:  It's a statement from-- it's a letter

15  from Mr. Cader to Ms. Ser, the lawyer in Hong Kong, setting

16  forth the history of the loan payments, the amount of the loans

17  and the conditions that were appurtenant thereto.  It was my

18  understanding that that letter was attached to Ms. Bond's Form

19  E's which were provided to Mr. Lichtenstein.

20         THE COURT:  All right.  And the letter you just

21  referred to, is that the letter you were referring to

22  previously?

23         MR. LAPIDOW:  Yes, sir.

24         THE COURT:  So it was in evidence in that proceeding?

25         MR. LAPIDOW:  That is my understanding, sir.

D7HBLICC

```
 1            THE COURT:  And do you have a copy of that letter?

 2            MR. LAPIDOW:  I do now.

 3            THE COURT:  All right.  And has that not at this time

 4    been produced to Mr. Arkin in this lawsuit?

 5            MR. LAPIDOW:  It has not been produced to Mr. Arkin in

 6    this lawsuit.

 7            THE COURT:  And why--

 8            MR. ARKIN:  Excuse me.  I need to be fair here.

 9    That's what we're all about.  I have received a copy of that

10    letter.  I'm not going to waste this Court's time with your

11    burdens characterizing it, but it is nothing which gives any

12    specific comfort to an intelligent inquirer as to the nature of

13    the financial relationship between Ms. Bond and Mr. Cader.  It

14    is, to put it in nice words, a windy-wandy, somewhat obtuse

15    declaration --

16            THE COURT:  What was the phrase you used?

17    Windy-wandy?

18            MR. ARKIN:  Windy-wandy, winding.

19            THE COURT:  This case, in all of the proceedings we've

20    had, always comes up with new phrases that I don't know and

21    I'll have to remember to use.  But I'm still using "small beer"

22    from the last time.

23            MR. REISEN:  I was just going to say, "small beer" was

24    my favorite.

25            MR. LAPIDOW:  How about if you give a mouse a cookie,
```

D7HBLICC

1    your Honor?  You've got to love that one.

2             THE COURT:  I've recounted that to numerous people.

3             In any event, so you've had the letter, but you're

4    unhappy with the letter.  On the other hand--

5             MR. ARKIN:  Not unhappy.  Unsatisfied, your Honor.

6    Unhappiness takes a much greater standard of conduct or

7    happening to make me --

8             THE COURT:  Well, let me tell you the way I was going

9    to approach this and still think we should approach it,

10   although I --

11            MR. ARKIN:  Would you mind if I sat down?  I have a--

12            THE COURT:  No, you may sit down.  And you may sit

13   down, too.

14            MR. LAPIDOW:  Thank you, your Honor.

15            THE COURT:  I think I've heard enough from counsel.

16            MR. LAPIDOW:  Thank you.

17            THE COURT:  It seems to me that we're in a slightly

18   unusual posture here, but frankly a better one than we were in

19   in May, when we were together, because at least now there is a

20   decision of the Hong Kong Court, whatever it may say.  And it

21   sounds like it does address, at least in part, one of the core

22   issues in this lawsuit.

23            What I had anticipated saying today I think I will

24   modify a little bit in this sense:  I think there is, as a

25   threshold matter, a legal question about whether this lawsuit

D7HBLICC

1    is viable.  And, as such, I think we need to fully brief and

2    decide that.  And if it is viable, then we proceed beyond that;

3    and if it's not, then the case is dismissed.

4           And, remember, Judge Kaplan has referred this to me

5    for general pretrial supervision and for any dispositive

6    motion.  So this is going to be a two-part process:  The

7    motion's going to be fully briefed, I'm going to make a report

8    and recommendation to Judge Kaplan, and then he's going to

9    decide whether to accept it or reject it.  And whoever I find

10   against will have the opportunity to submit objections to Judge

11   Kaplan.  So I'm eager to move that process along.

12          What I was also going to say is that, given that the

13   threshold issues here, in my opinion, are legal ones -- whether

14   the lawsuit is a viable lawsuit is a matter of law, leaving

15   aside the factual underpinnings here -- I was otherwise

16   planning to stay discovery but for the production of the

17   limited document discovery that Mr. Arkin indicated that he

18   wanted to have.  And the way I planned to address that issue

19   was to require Mr. Cader to produce to Mr. Arkin whatever it

20   was that had been produced in the Hong Kong lawsuit to Ms. Bond

21   to Mr. Arkin in his capacity as Mr. Lichtenstein's lawyer in

22   New York.

23          I now understand from colloquy this morning that

24   whatever was produced by Mr. Cader to Ms. Bond's lawyers in

25   Hong Kong is this letter as part of the Form E submission.

D7HBLICC

 1    And, Mr. Arkin, you now have said that you have that letter.

 2    And if there are no documents other than that-- is that

 3    correct?

 4              MR. LAPIDOW:  I do not know whether anything else was

 5    produced by Mr. Cader in Hong Kong.  It's the only document of

 6    which I am aware, your Honor.

 7              THE COURT:  Well, I guess what I will say then, and

 8    what I will order, is that whatever documents Mr. Cader

 9    produced to Ms. Bond's lawyers in the Hong Kong proceeding, I

10    will direct you to obtain, if you don't otherwise have them,

11    and produce them to Mr. Arkin in this proceeding.  And that is

12    the limit of the discovery I'm going to allow at this juncture

13    before the motion to dismiss is fully adjudicated.

14              I am not convinced that a deposition, however limited

15    Mr. Arkin tells me he will conduct it, is going to advance any

16    inquiry that I need to conduct with respect to the legal issues

17    that are before the Court.  And if I deny the motion to

18    dismiss, then full discovery can commence and it won't be

19    limited.  We'll figure out what it would entail at that point.

20              So that is what I think we should do and that is, in

21    fact, what I am ordering that we do.

22              And I guess my next question --

23              MR. ARKIN:  May I address that?  No?  Okay.

24              THE COURT:  Let me finish what I want to do.  Okay?

25              MR. ARKIN:  All right.  Go ahead.

D7HBLICC

1          THE COURT:  If you want to make an application to

2    reconsider what I'm saying, as you did the last time, I'll hear

3    you, but let me do what I want to do first.

4          MR. ARKIN:  Surely.  I'll sit down then.

5          THE COURT:  Mr. Lapidow, you made your motion in May.

6    Mr. Arkin has since filed an amended complaint and the Hong

7    Kong Court has now rendered a decision.

8          Does that mean that you want to revise, modify,

9    supplement, amend your motion papers in some way?

10          MR. LAPIDOW:  I do, and I would really like to see the

11   Hong Kong decision before I renew my application because it may

12   very well have relevance.

13          THE COURT:  I hear you on that and we can build in a

14   schedule which I hope will allow for you to do so.  Because I

15   think another order, to the extent I have any authority to do

16   so, is to direct Mr. Arkin to make best efforts to get a copy

17   of that decision to you and to me.  And if it means making an

18   application that it be maintained under seal in this Court

19   until such time as it is made public in Hong Kong, then so be

20   it.  But it seems to me that it would be relevant to have that

21   decision before the Court in any event.

22          MR. ARKIN:  I'll do it.

23          MR. LAPIDOW:  I was going to suggest, your Honor, that

24   we would be perfectly willing to file whatever papers we file

25   under seal with the Court if that solves any -- or enter into a

D7HBLICC

 1   protective order.  I'm willing to do whatever needs to be done.

 2   We certainly are happy to do whatever to keep it as private as

 3   possible.

 4               THE COURT:  Well, I obviously don't have authority to

 5   direct the Hong Kong Court to do anything with its opinion.  It

 6   is going to do whatever it's going to do consistent with Hong

 7   Kong law.

 8               But, Mr. Arkin, if you can have Mr. Lichtenstein's

 9   counsel in the Hong Kong proceeding make whatever application

10   is necessary to make the Hong Kong decision available to this

11   Court and to Mr. Lapidow as part of these proceedings.  Whether

12   it needs to be submitted pursuant to a protective order and

13   maintained under seal, if that's necessary, obviously I'll sign

14   such order that the parties can submit or you can stipulate to

15   it or whatever.

16               So I know you want to speak to larger things, but

17   let's just --

18               MR. ARKIN:  No, to that particular thing absolutely I

19   will make that address or request this morning as we leave your

20   court.

21               THE COURT:  So why don't we say this, because I think

22   this is probably realistic.  It's July 17th now.  Why don't we

23   say that you'll renew your motion papers 30 days from now.

24               Is that sufficient or do you need more time?

25               MR. LAPIDOW:  I was going to suggest two weeks from

1   the date that we get the opinion because that's sort of the

2   gatekeeper here, is when we have-- because I think we really do

3   need to know what the Hong Kong court has said.  And I'm happy

4   to do it as quickly as possible.  After that-- I mean, 30 days,

5   I'm happy to agree to that, your Honor, assuming that we don't

6   get it on the 29th-and-a-half day or something.

7              THE COURT:  No, that's fine.  I'm perfectly happy to

8   proceed along those lines.  In other words, you're suggesting

9   that two weeks from the date you receive a copy of the opinion,

10  you'll renew your motion in whatever modified form you're going

11  to.

12             MR. LAPIDOW:  Absolutely, your Honor.

13             THE COURT:  All right.

14             MR. ARKIN:  May I add a coda?

15             THE COURT:  May you add a coda?

16             MR. ARKIN:  We can call it a codification for

17  reconsideration.  But just based on what your Honor and what

18  Mr. Lapidow have said, I think it congeals the issue in my mind

19  enough to express to your Honor, which is that I agree that

20  Mr. Lapidow should have a copy of the opinion.  Most certainly.

21  And, frankly, I don't see why they keep it secret right now

22  anyway.  But, in any event, I will do everything I can to get

23  it to Mr. Lapidow, and of course your Honor first.  And if I

24  need a confidentiality order, I'll speak to Mr. Lapidow and see

25  if we can submit one jointly.

D7HBLICC

1              But I was going to say I agree with Mr. Lapidow that

2      he ought to have the opinion before he writes his motion papers

3      or revises his motion papers.  In much the same way, I think I

4      ought to have any written communications, including e-mails,

5      between Mr. Cader and Ms. Bond because that may sustain the

6      arguments which we are making here.  I think for my papers to

7      be as viable as I hope Mr. Lapidow's are, I should have that

8      much information as to what-- if I'm not going to be able to

9      examine him, there may be e-mails between the two of them which

10     suggest what I think took place.

11              THE COURT:  Well, here's the thing.  If I listened to

12     what you just said, you want to have e-mails between Mr. Cader

13     and Ms. Bond.  Right?

14              MR. ARKIN:  Or any written communications, yes, your

15     Honor.

16              THE COURT:  Any written communication and this is --

17              MR. ARKIN:  Which deals with money.

18              THE COURT:  Well, let's be realistic about this.

19     These are people who have a personal relationship.  Right?  So

20     to make the request you're making, if you made it in a formal

21     discovery request, I can be quite confident that Mr. Lapidow

22     would object to it as overbroad and burdensome given the nature

23     of the relationship I believe, as it's been described to me,

24     his client has with Ms. Bond.  So I'm not sure how viable or

25     realistic that request is.  And--

D7HBLICC

1          MR. ARKIN:  Well, you --

2          THE COURT:  -- as a threshold matter, there's a legal

3     question here as to whether this is properly in this Court.

4     And I don't think any communications between Mr. Cader and

5     Ms. Bond bear one wit on the legal issue here.  You can make an

6     argument in opposition to the motion, the equivalent, if you

7     will, of a Rule 56(d) type of argument if you wish.  If you

8     think that there were factual pieces of information you don't

9     have, but that discovery you believe would produce -- I know

10    the nature of the motion Mr. Lapidow is making is a Rule 12

11    motion and not a Rule 56 motion.  But that being said, if you

12    believe in opposition to the motion that there is a further

13    factual record that should and needs to be developed, I'm not

14    trying to hamstring you from making such an argument.  I just

15    think there are certain cases that lend themselves to threshold

16    dispositive motions as a matter of law that don't require the

17    Court, frankly, to examine the plausibility of the pleadings.

18          Now, I know as alternative argument point three or

19    point four of the motion papers that they've made, they argue

20    that this doesn't state a claim for fraud and all of that.  And

21    certainly as to those issues I think that there may be more of

22    a need for the kind of discovery you're talking about, but I'm

23    really focused on the *American Airlines* line of cases, the

24    *Altman* line of cases.  Those don't have anything to do with

25    what Mr. Cader said to Ms. Bond about the money.  It has to do

D7HBLICC

1   with whether you can properly bring the lawsuit you've brought

2   in this Court given the Hong Kong proceedings.  That's as I

3   understand the law.  Obviously you'll educate me more when the

4   matter is fully briefed.  That's why I'm eager to get it fully

5   briefed as soon as possible.

6        If Mr. Lapidow is wrong, you'll convince me he's

7   wrong.  You'll convince me he's not only wrong, but the case

8   should proceed on a factual basis, as lawsuits do, and his

9   motion I would recommend be denied.  And then he would object

10  and Judge Kaplan could decide whether you're right in

11  convincing me to deny the motion or not.

12       I'm not prejudging any of this.  I haven't had a full

13  motion briefed before me so I don't know.  I just know that if

14  we open the floodgates with limited discovery, it's going to

15  take us off in a kind of distracting way given what are obvious

16  threshold issues I think the Court needs to decide.  So that's

17  why I want to proceed the way I've said.

18       MR. ARKIN:  Just one more statement.  As I said in my

19  letter to your Honor, I recognize this is not the *Chevron* case

20  with which I will acknowledge to your Honor I have some

21  relationship.  I am not the litigating lawyer in the matter,

22  but I have a position in the case which I've had for some time.

23  Also, being somebody who's practiced in this court for 50

24  years, I think I read most decisions which come out one way or

25  another.

D7HBLICC

1          It seems to me that an issue here is the

2     intentionality of Mr. Cader and Ms. Bond to mislead a foreign

3     court.  And while that is small potatoes compared to a $19

4     billion judgment in Ecuador and bribing an Ecuadorian judge, it

5     seems to me it's along the same lines as doing something which

6     is foul and wrong in this jurisdiction to impact the outcome in

7     another jurisdiction.  And I do believe this Court has

8     jurisdiction over that kind of a dispute.

9          And you can take *Chevron*, which of course is egregious

10    and unique in some respects, but the underlying theme, as I

11    understand Judge Kaplan's opinions and actions, is that if you

12    do something here dishonest which you intend to inflict upon a

13    foreign court, it's actionable here.

14         Now, what took place in *Chevron* was far more egregious

15    on just a size basis and also included bribery.  But I think if

16    you agree to lie in a foreign court and you do it in this

17    jurisdiction, we should stop.

18         That's what I have to say, your Honor.  And I

19    understand what your Honor's rulings are.  Obviously, we'll

20    abide them.  By the way, nothing I say is meant to suggest that

21    you're other than an impartial, thoughtful judge.  It's only

22    meant to suggest I see the issue somewhat different.  I have a

23    small sample of the kind of things which I think are

24    happening -- in my view, I read a lot of cases -- around the

25    world where you do something in one country to use it to mess

D7HBLICC

1   up a case in another country.

2          And in these days when people forum shop-- you know,

3   Ms. Bond went to the UK.  Then she went from the UK to the Hong

4   Kong, where her father is the taipan of Hong Kong.  I mean, she

5   went into a court which has every reason to embrace her with

6   great affection.  And it was my hope that the solicitors and

7   the barristers that we had in Hong Kong would have had the

8   opportunity of demonstrating that there was a falsehood

9   inflicted upon that Court.

10          And while the Court did say they were soft loans, my

11   view is that evidence, an actual agreed-upon lie, would have

12   great weight with any judge in any civilized court in this

13   world.  And in these days it's an important issue that we be

14   honest when our findings or our actions in this country, this

15   state, this city, afflict a foreign court.

16          THE COURT:  Mr. Arkin, how much time will you need to

17   file your opposition papers to the motion once it's filed,

18   which will be 14 days after Mr. Lapidow gets the decision?

19          MR. ARKIN:  Give us a couple of weeks.

20          THE COURT:  Two weeks?

21          MR. ARKIN:  Yes.

22          THE COURT:  Okay.

23          MR. ARKIN:  I mean, it seems to me we wouldn't need

24   more than that.

25          THE COURT:  I'm happy to give you anything that's

D7HBLICC

1    reasonable.  Two weeks is certainly reasonable.

2              MR. ARKIN:  If it turns out to be some burdensome and

3    I have flights of notions that I should inform your Court of

4    all kinds of other things about the world, I'll ask you for

5    more time and tell you why.

6              THE COURT:  Well, I'd just assume not have that.  I'd

7    rather give you more time and then keep to the schedule,

8    frankly.

9              MR. ARKIN:  Let's say two weeks now then.

10             THE COURT:  Well, I don't want to say "two weeks now

11   then" and then have you make an application after you get his

12   papers and say I need two more weeks.  Why don't I just give

13   you 30 days?  Then you don't have to ask for a request.  If you

14   want to submit them earlier --

15             MR. ARKIN:  That's fine.

16             THE COURT:  -- you can submit them earlier.

17             MR. ARKIN:  That's fine.  I can always file it sooner

18   than 30 days.

19             THE COURT:  All right.  And then you'll file the reply

20   papers?

21             MR. LAPIDOW:  Two weeks.

22             THE COURT:  All right.  The schedule will set -- and

23   I'll issue an order to this effect -- is two weeks after you've

24   received the decision -- and I assume when you receive it,

25   hopefully I'll be receiving it soon thereafter -- you'll file

D7HBLICC

1    your renewed motion papers.  The plaintiff will have 30 days to

2    respond and you'll have two weeks thereafter to file a reply

3    and then it will be fully submitted.

4            Discovery is stayed during the pendency of the motion

5    but for the production of the documents that were produced by

6    Mr. Cader to Ms. Bond in the Hong Kong proceeding.  Whatever

7    documents they may be, you should produce to Mr. Arkin in

8    advance of your motion.

9            MR. LAPIDOW:  Thank you, your Honor.  In that regard,

10   can I use you as an interlocutor?  Since I've not seen any of

11   the materials that were produced in Hong Kong, can you inquire

12   of Mr. Arkin whether, along with the letter that Mr. Cader

13   provided to Ms. Bond's counsel that was attached, as I

14   understand it, in Ms. Bond's Form E, whether there was anything

15   else that was also provided?  I just don't know.

16           THE COURT:  Mr. Arkin, have you received any other

17   documents --

18           MR. ARKIN:  No.  What I have is the Form E and --

19           THE COURT:  I'm sorry?

20           MR. ARKIN:  I didn't know that it was attached.  I

21   have the copy of the letter which Mr. Cader penned.  It is

22   literate, but not terribly substantive.

23           THE COURT:  I don't need a characterization.  I'm

24   asking you a straightforward question.  All right?

25           MR. ARKIN:  The answer is --

D7HBLICC

1          THE COURT:  I don't need poetry about it.  I just need
2     an answer.
3          MR. ARKIN:  Well, the answer is I have that letter,
4     but I don't have the other communications between the two which
5     would help me make my point to this Court.
6          THE COURT:  That's not responsive to my question.  My
7     question was, what else was produced to you, if anything?
8          MR. ARKIN:  Oh, no, nothing.  I have the 4(e)-- excuse
9     me, the Form E, and I have a copy of the letter about which
10    Mr. Lapidow speaks and--
11         MR. REISEN:  Cader may have given the Hong Kong
12    lawyers other documents that we don't have--
13         MR. ARKIN:  Well, and Mr. --
14         THE COURT:  What I'm trying to understand --
15         MR. ARKIN:  The no other documents--
16         THE COURT:  Why don't we all three speak so that the
17    court reporter can really use eight hands instead of the two
18    she has.
19         What I want you to do -- you represented to the Court
20    in the May proceeding that you understood there were documents,
21    plural, produced in the Hong Kong proceeding by your client to
22    Ms. Bond.  Correct?
23         MR. LAPIDOW:  I --
24         THE COURT:  Whatever that collection of documents is,
25    whatever Mr. Arkin may or may not have, you figure out what was

D7HBLICC

```
 1   produced.  And I want you to give everything that was produced
 2   in the Hong Kong case by Mr. Cader to Ms. Bond's attorneys,
 3   solicitors, I want you to find that out, get it, and give it to
 4   Mr. Arkin.  And I want you to do that in advance of the motion
 5   practice so that if it's useful to him in making the arguments
 6   he wants to make, he will have it.
 7              MR. LAPIDOW:  Understood, your Honor.  I didn't mean
 8   to create more confusion.
 9              THE COURT:  Okay.  So I think we have resolved
10   everything I want to and can resolve today.  There's a stay of
11   discovery but for what we've said.  We have a motion practice
12   schedule and we've talked about how to deal with the Hong Kong
13   opinion.
14              Anything else that either counsel thinks we need to
15   address today?
16              MR. LAPIDOW:  Do you have a formal confidentiality
17   order that your chamber likes to use or should we just...
18              THE COURT:  The answer is no.  I know a few judges put
19   a form order.  I do not have such a thing.  You can do whatever
20   makes sense for both of you in these somewhat unusual, if not
21   unique, circumstances.
22              MR. LAPIDOW:  We'll cobble something together if it's
23   necessary.
24              THE COURT:  That's fine.
25              All right.  Anything else, Mr. Lapidow?
```

D7HBLICC

1            MR. LAPIDOW:  No, your Honor.

2            THE COURT:  Mr. Arkin, anything further?

3            MR. ARKIN:  Thank you for your courtesy, your

4    thoughtfulness.  All I wish to say as I leave your courtroom is

5    that the underlying issues in this case, if it goes forward,

6    are quite fascinating.

7            THE COURT:  All right.  Well, I look forward to

8    hearing more about all of this.  In the meantime, I bid you a

9    good summer.

10            MR. LAPIDOW:  Thank you.  Stay cool, your Honor.

11            MR. REISEN:  Thank you, your Honor.

12            MR. ARKIN:  Thank you very much.

13            (Adjourned)

14

15

16

17

18

19

20

21

22

23

24

25